## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

YURI GARMASHOV,

     Plaintiff,

v.

UNITED STATES PARACHUTE
ASSOCIATION, INC.,

     Defendant.

_____

Case No.: **1:21-cv-04917-JGK**

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO ENFORCE A PURPORTED SETTLEMENT

Respectfully submitted,

**WINGET SPADAFORA
SCHWARTZBERG, LLP**
*Attorneys for Defendant,*
*United States Parachute Association, Inc.,*
45 Broadway, 32nd Floor
New York, New York, 10006
Telephone (212)-221-6900
Facsimile (212)-221-6989

*Of Counsel:*

Kenneth A. McLellan, Esq.
Keith R.M. Roussel, Esq.

## <u>TABLE OF CONTENTS</u>

<u>Page No.</u>

PRELIMINARY STATEMENT ...............................................................................................1

STATEMENT OF FACTS ......................................................................................................4

ARGUMENT ..........................................................................................................................10

CONCLUSION.......................................................................................................................17

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

<u>Hostcentric Technologies, Inc. v. Republic Thunderbolt</u>, LLC, 2005 WL 1377853 (SDNY 2005).
Not Reported in F.Supp.2d. ..........................................................................................................16

<u>Johnson v. Fordham University</u>, 2016 WL 450424 (SDNY 2016).
Not Reported in Fed. Supp..........................................................................................................14

<u>Kowalchuk v Stroup</u>, 61 A.D.3d 118 (1st Dep't. 2009). ...............................................................15

<u>Murphy v. Institute of International Education</u>, 32 F.4th 146 (2nd Cir. 2022)..............................12

<u>Teachers Ins. and Annuity Ass'n of America v. Tribune Co.</u>, 670 F.Supp. 491 (SDNY 1987)…11

<u>Winston v. Mediafare Entertainment Corp.</u>, 777 F.2d 78 (2nd Cir. 1985)  ....................................13

1.      The UNITED STATES PARACHUTE ASSOCIATION, INC., ("USPA"), through its counsel, WINGET, SPADAFORA & SCHWARTZBERG, LLP, submits the within Memorandum of Law in Opposition to Plaintiff's motion to enforce a purported settlement and for attorneys' fees.  Plaintiff's motion is without merit, and we request that this Court deny Plaintiff's motion in its entirety, and grant such other and further relief as may be just and proper under the circumstances.

## PRELIMINARY STATEMENT

2.      We oppose Plaintiff's motion to enforce a purported settlement.  The USPA does not have an agreement with the Plaintiff on an important material term.  Further, Plaintiff's counsel's request for fees is without merit.  As a result, we request that Plaintiff's motion be denied in its entirety.

3.      Mr. Garmashov's membership from the USPA was revoked on October 13, 2016. He had been a member of the USPA, and also had instructional ratings.  This conferred a high status and level of responsibility in the organization wherein he was authorized to administer courses to and certify members of the USPA who sought to act as tandem skydive instructors.

4.      A tandem skydive is "a skydiving experience where two people jump out of an airplane together, strapped to one another during the entire descent. The connecting straps make it so that one person is floating above the other during the freefall, with one's back against the other's front side." [1]   Many beginners learn to skydive in tandem jumping scenarios.  It is critically important that the skydiving instructor tandem jumping with a beginner understand all safety protocols and emergency procedures.  Tandem Examiners (which, Mr. Garmashov was one) who

---

[1] https://www.skydivecsc.com/blog/what-is-tandem-skydiving

train instructors and grant the USPA's authority to those who those who would teach others to conduct tandem skydives have an even greater responsibility.

5.     Part of what led to the revocation was the fact that Mr. Garmashov's signature appeared on documentation, called a candidate proficiency card, which is used to track the performance of a tandem instructor candidate, where a person was seeking an instructor rating. Mr. Garmashov's signature appeared on a card of an instructor that conducted a tandem skydive with a first-time jumper which resulted in the death of the instructor and the first time jumper as the result of incorrect procedures being executed during a jump in Lodi, California.  The USPA conducted an investigation that revealed:

> some people who took courses at the Parachute Center in Lodi were not properly taught and/or certified.
>
> USPA officials noted certain courses may have been abbreviated or incomplete, and people did not meet initial qualifications.[2]

6.     The USPA conducted an investigation that showed that a number of tandem instructor candidates trained by, and whose instructor proficiency cards bore Mr. Garmashov's signature did not know or understand critical safety procedures.  Further, many of those who took courses with Mr. Garmashov's involvement had to be re-trained.   Importantly, during its investigation, the USPA found videos of Mr. Garmashov engaging in what appeared to be some kind of horseplay with a student strapped to him just before exiting the plane for a jump; performing a dance move (the "Running Man") during freefall; and, using a "selfie stick" to take photos during free fall with a student strapped to him.  These are examples of activities that are dangerous to tandem skydivers, and the general public below.

---

[2] https://www.abc10.com/article/news/local/lodi/lodi-skydiving-school-pay-40m-death-of-18-year-old/103-a49e6899-f6e9-4be1-8d5a-aae3facf3f23

7.     The USPA is authorized under its own Governance Manual to revoke a membership and an instructional rating.  The USPA's procedures allow for a hearing for a member who is subjected to disciplinary action, but it is not a full court trial.  Proof of facts sufficient to justify a finding that an offense has been committed shall be by a preponderance of the evidence standard.[3]

8.     Those who hold Instructional Ratings are held to a high standard by the organization.  They are required to uphold the following standards as stated in the Instructors Rating Manual:

> Act in a professional manner, with honesty, integrity, and ethical conduct while interacting with all students, members, and the public. Exercises principles of good judgment for the safety of yourself and others. Avoid impropriety and misconduct and commit to the USPA Values Statement.
>
> Act as role models and embrace the concept of leadership in teaching and mentoring in all aspects of training. Ensure that all documents and records associated with the privileges of the rating are accurate, complete, and submitted in a timely manner. Take responsibility to maintain and update their professional skill sets, content knowledge, and competency on an ongoing basis.[4]

9.     Mr. Garmashov has been seeking readmission to the USPA and reinstatement of ratings.  However, rather than approaching the Board and attempting to demonstrate recognition of past deficiencies and a commitment to address those going forward, he has sued the USPA, twice, and has retained counsel in order to engage in a campaign of frivolous, time-consuming legal action, threats and harassment.

---

[3] https://uspa.org/Portals/0/files/Man_GovMan.pdf, Section 1-6 Disciplinary Procedures.

[4] See https://uspa.org/IRM and https://uspa.org/Portals/0/files/Man_IRM_2021_Rev2.pdf

10.     The USPA negotiated in good faith with Mr. Garmashov and his counsel.  Many hours were spent in mediation on an accelerated time table.  The USPA arrived at a resolution that involved a monetary payment, in exchange for Mr. Garmashov releasing the USPA from liability, the USPA not admitting liability, confidentiality and, importantly, **no membership**.  A settlement in principle was reached on that basis.  The intent of the settlement from the USPA's perspective was for Mr. Garmashov and his counsel to --- excuse the bluntness --- "go away."

11.     Plaintiff's Counsel now disingenuously argues that Mr. Garmashov should receive payment, and yet continue to pursue his campaign for reinstatement.  This defeats the purpose of the settlement.  We ask that the Court not enforce the purported settlement terms put forth by counsel, and that it grant such other and further relief as may be just and proper under the circumstances.  To make matters worse, counsel has the gall to demand costs, without any basis.

## STATEMENT OF FACTS

12.     By way of background, "[The USPA] is a voluntary non-profit membership organization of individuals who enjoy and support the sport of skydiving. The association is incorporated in New York and follows the by-laws contained in the **USPA Governance Manual**[5]."  The current Governance Manual of the USPA issued October, 2021, provides, in pertinent part, that: "The purposes for which USPA is formed are as follows [among other things]: … to promote safety in all skydiving activities in the United States [.]"  See Governance Manual, October, 2021, Section 1-1(2)[6].

13.     The USPA issues manuals that contains rules and requirements.  See Governance Manual, October, 2021, 4-1:3.A[7].  One of the relevant Manuals here is the Instructional Rating

---

[5] https://uspa.org/Portals/0/files/Man_GovMan.pdf

[6] See Id.
[7] See Id.

Manual, 2021-2022.  Ratings permit a person to "teach the teachers" of the sport of skydiving.  To have an Instructional Rating is a high honor, privilege and responsibility in the USPA.  The USPA's expectations of ratings holders is discussed in detail at Page, Section 1:1-1 of the Instructional Rating Manual.  A high degree of professionalism, integrity and proficiency is required.  The USPA administers three instructional ratings:  Coach; Instructor; and, Examiner.  C-1:1.A.1[8] (p.19.).  An examiner is the highest rating, and, a person with an examiner rating is allowed to supervise a Coach.

14.     Mr. Garmashov's USPA membership and ratings were revoked on October 13, 2016.  The letter provides that "the specific violation is that on or about July 25, 2015, USPA suspended the Coach Examiner and Tandem Instructor Examiner ratings of Rob Pooley.  After that date, Pooley continued conducting rating courses as an examiner, using candidate proficiency cards signed by you as the examiner for the rating course."  An examiner trained by Mr. Pooley died, along with a first-time jumper, in a fatal accident that occurred on August 6, 2016.  Mr. Garmashov's signature appeared on the Candidate Proficiency Card.  An investigation conducted by the USPA revealed that instruction imparted to tandem instructors by Mr. Pooley, on occasions when Mr. Garmashov was present, was substandard.  Candidates trained by Mr. Pooley and Mr. Garmashov showed a lack of understanding of parachute malfunctions and emergency procedures.  It was found that even though Mr. Garmashov's name appeared on their paperwork, Mr. Garmashov was not involved with their courses.

15.     Mr. Garmashov, through counsel, has now sued the USPA twice, once in California[9] and once in this Court, in an effort to strong-arm and bully the USPA into accepting

---

[8] See Id. at Page 19.
[9] YURI GARMASHOV v. UNITED STATES PARACHUTE ASSOCIATION, INC., UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA, 2:20-cv-01392-KJM-CKD

him back into the organization.  The USPA's Board and leadership, including its Executive Director, take their responsibilities seriously, and, as will be shown in more detail herein, made a decision to pay a monetary settlement to Mr. Garmashov, in order to buy its peace and protect the integrity of the USPA.  As will be shown in communications exchanged during negotiations, the intent of the settlement was to part ways with Mr. Garmashov, permanently.  Mr. Garmashov and his counsel have wasted an enormous amount of the USPA's time and effort.  The USPA has an all-volunteer Board made up of people who are passionate about the sport and the safety of its members, and proper qualification of its instructors.

16.     Rather than persuading the Board that he understands that mistakes were made in the past, and promising to take steps to correct and modify his conduct, instead, he asks this Court in his Complaint to force the USPA to reinstate his membership and ratings, and, to pay his counsel as well.  In addition, Plaintiff seeks a monetary award even though Mr. Garmashov flouted the rules of the USPA with impunity.

17.     The purpose of the settlement of this action was for the USPA and Mr. Garmashov to go their separate ways.  Plaintiff and his counsel now disingenuously are trying to reap a monetary settlement, and gain re-entry to the USPA.  Plaintiff seeks to do this without modifying his past conduct, and without committing to follow the USPA's rules and regulations.

18.     In his motion, Plaintiff's counsel opportunistically cherry-picks e-mail correspondence out of context to attempt to support an argument that after the USPA agreed to pay a monetary settlement to Mr. Garmashov, he should also have the ability to continue to seek readmission to the USPA.

19.     There are two important e-mails Plaintiff's counsel does not discuss.  We do not know if counsel was provided with the first one verbatim as it had been sent to the Court appointed mediator, Ms. Holly Weiss.

20.     The below e-mail was sent on May 11, 2022, at 2:18 PM.  Settlement dollar amount offers are redacted:

> Good afternoon Holly-
>
> We communicated with our clients and the carrier last night and this morning, and their position has not changed. The offer remains: $ xx firm. No membership or ratings. Take it or leave it. Confidentiality and no admission of liability. Full general release. As to Plaintiff's claim that it will prevail in obtaining injunctive relief against the USPA does not comport with New York Law on this issue. (See generally *Kiwanis Club v. Board of Trustees of Kiwanis*, 41 N.Y.2d 1034 (NY 1977)). The Court will not "permit governmental supervision of essentially private activity[.]" The case is attached.
>
> We very much appreciate your help on this case. Our side's position is discussed in more detail below:
> ===========================================
> The USPA and its insurer entered this Court ordered mediation in good faith and we prepared for our first session based on Plaintiff's counsel representation that Plaintiff wanted his USPA membership to be reinstated and that Plaintiff's money demand was being used for leverage to gain re-entry. Going into the mediation, our understanding was that this was not about the money.
>
> When we attended the first session on Tues., May 3, 2022. of Plaintiff's counsel Alex Kaufman for the first time indicated that the case would not settle without a monetary payment[10]. Since we and the USPA had initially been led to

---

[10] We note that, on or before February 11, 2022, we had a telephone conference with one of Plaintiff's counsel, Eric Underriner.  Mr. Underriner noted during a telephone conversation if Mr. Garmashov were to be readmitted to the organization that he would recommend that there be no monetary settlement.  We

believe this case was really about reinstatement, and not about money, the USPA had not prepared to discuss a monetary settlement payment at the first session.

In good faith we and the USPA, at great inconvenience to us and our clients, agreed to an unreasonably short adjournment to hold a second session on Monday May 8, 2022 at 9:00 a.m.

To accomplish this request we had to evaluate the Plaintiff's monetary demand immediately, in a vacuum with no supporting documentation for the monetary damages alleged by Plaintiff. The USPA Executive Committee met on a Sunday night of Mother's Day on short notice to discuss their position, since Plaintiff Mr. Garamshov [*sic* should say Garmashov] was suddenly in an urgent hurry to discuss money.  After that weekend session the USPA was still willing to permit Plaintiff to become a member and to pay Plaintiff some monetary amount to resolve this lawsuit mostly on a cost basis.

**We advised during the course of the negotiations that at some point if the monetary demand became too high that the Plaintiff's Request for reinstatement to USPA would no longer be considered/offered.**

---

conveyed that message to the USPA's insurer in privileged correspondence which will be provided to the Court *in camera* if required by the Court.  We did not expect Plaintiff's counsel, shortly thereafter, to present a mediation position statement wherein he claimed substantial money damages in the form of lost wages. It was particularly unexpected because Plaintiff's counsel Alex Kaufman supplied no documentation whatsoever to support such a claim, even though we requested it.  Mr. Kaufman statement that the mediation had to be "suspended" on May 3, 2022 is inaccurate.  We attended mediation ready to discuss our client's position, and we attended with the Executive Director of the USPA, Albert Berchtold, who was authorized to discuss reinstatement of membership and to communicate with the Executive Committee of the USPA on issues pertaining to resolution of the case.  There appears to be either a difference of opinion between Plaintiff's attorneys working on the case, or a lack of communication.  We wish to ensure that the record is clear and factually accurate.

We were very clear and transparent in our offers as to when that was on the table, and when it was removed. When the USPA's offer went up to $xx membership was removed from the equation. Plaintiff's counsel then took the stance that only a [substantial, dollar amount redacted] offer would be considered. We and the USPA rightfully considered that as an abandonment of the request for membership. Plaintiff and his counsel burned a bridge at that point.

Similar to other times that the USPA gave Plaintiff a chance to take steps toward reinstatement, and provided guidance on steps to potential reinstatement, Plaintiff in this mediation wanted money, membership and ratings immediately without being willing to go through the process that the USPA required. Plaintiff and his counsel have squandered numerous opportunities.

At this point the only voluntary settlement offer on the table is **"$xx is the best and final offer. No membership. Take it or leave it. Also of course the full release and confidentiality along with no admission of liability."**

We ask that you convey this. Of course, when we start doing discovery, the offer could change or be pulled.

Thanks.

-Ken"

21.    Plaintiff's counsel then provided a purported "term sheet," that he prepared, already signed by Mr. Garmashov.  See Motion to Enforce, **Exhibit 5.**  It was not prepared by the mediator as is standard practice.  We forwarded this term sheet to our client.  The term sheet was silent on the membership issue, though that term was conveyed to the mediator.  Plaintiff's counsel fails to mention one critical email in his motion.  It is telling that he failed to highlight that email, because it is fatal to his motion.

22.    On May 12, 2022 at 11:06  p.m. Mr. Kaufman stated:

> "**Can you please confirm that the term sheet is accepted?**"

> See Motion to Enforce, **Exhibit 8** p. 5 (**Emphasis Added**).

23.     If Mr. Kaufman sincerely believed the terms were accepted as he proposed in his term sheet, there would have been no need for such an e-mail.

24.     For the sake of transparency and clarity, we advised counsel in an e-mail dated May 13, 2022 at 8:12 a.m.:

> The term sheet added mutual general releases, which I don't expect to be a problem and will recommend.  I anticipate speaking with Mr. Berchtold today on the sheet.

> The point of this settlement is that USPA pays money and, in return, does not have to deal with Mr. Garmashov any more.  That is implicit in this deal, and will be spelled out in the formal settlement agreement.  He doesn't come back.  You don't come back.  No more applications to be in the USPA;  no demands for arbitration; no applications to get back in.

> I want that to be clear.  Please confirm that we're in agreement on this.

> Thanks.

> -Ken

> See Plaintiff's Motion to Enforce, **Exhibit 8** pp. 3&4.

25.     Consistent with Plaintiff's counsel's sharp practice earlier in this case, our e-mail was met with a threat of frivolous motion practice.  However, a review of the e-mails in context clearly shows that Plaintiff's motion to enforce is without merit and should be denied by this Court. It is a ploy for Plaintiff and his counsel to get more than they bargained for.

## ARGUMENT

26.     The relevant case law requires that Plaintiff's motion be denied.

27. This Court, has provided guidance on two distinct types of preliminary contracts with binding force:

> Preliminary contracts with binding force can be of at least two distinct types. One occurs when the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation. Such an agreement is preliminary only in form—only in the sense that the parties desire a more elaborate formalization of the agreement. The second stage is not necessary; it is merely considered desirable. As the Court of Appeals stated with respect to such preliminary agreements in V'Soske v. Barwick, 404 F.2d 495, 499 (2d Cir.), *cert. denied,* 394 U.S. 921, 89 S. Ct. 1197, 22 L.Ed.2d 454 (1969), "the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event.... Restatement (Second) of Contracts, § 26 (then Tert. Draft No. 1, 1964); 1 Corbin on Contracts § 30 (1950); 1 Williston on Contracts § 28 (3d ed. 1957)."
>
> **The second and different sort of preliminary binding agreement is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated**. Although the existence of open terms generally suggests that binding agreement has not been reached, that is not necessarily so. For the parties can bind themselves to a concededly incomplete agreement in the sense that **they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement**. To differentiate this sort of preliminary agreement from the first, it might be referred to as a binding preliminary commitment. Its binding obligations are of a different order than those which arise out of the first type discussed above. The first type binds both sides to their ultimate contractual objective in recognition that that contract has been reached, despite the anticipation of further formalities. **The second type—the binding preliminary commitment—does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate objective within the agreed framework.** In the first type, a party may lawfully demand performance of the transaction even if no further steps have been taken following the making of the "preliminary" agreement. **In the second type, he may not. What he may demand, however, is that his counterparty negotiate the open terms in good faith toward a final contract incorporating the agreed terms**. This obligation does not guarantee that the final contract will be concluded if both parties comport with their obligation, as good faith differences in the negotiation of the open issues may prevent a reaching of final contract. It is also possible that the parties will lose interest as circumstances change and will mutually abandon the negotiation. **<u>The obligation does, however, bar a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement</u>." (Emphasis Added**).

See <u>Teachers Ins. and Annuity Ass'n of America v. Tribune Co.</u>, 670 F.Supp. 491 (SDNY 1987).

28.     As we discuss herein in this action, the unilaterally prepared purported term sheet was the second type of preliminary contract with binding force which at most does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate objective within the agreed framework.

29.     In a recent decision not cited by Plaintiff's counsel, the Second Circuit handed down a decision where the parties and their attorneys signed a mediation agreement, as did the mediator.  This is different from our action, where the Plaintiff's counsel --- without our input --- prepared a purported term sheet that reflected only a portion of the terms offered by the USPA:

> In <u>Teachers Insurance and Annuity Association of America v. Tribune Co., 670 F. Supp. 491 (S.D.N.Y 1987),</u> Judge Leval – then on the district court – described two kinds of preliminary contracts that are recognized under New York law. The first (Type I) "occurs when the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation." <u>Id.</u> at 498.  This kind of agreement is preliminary "only in the sense that the parties desire a more elaborate formalization of the agreement," which, although not necessary, is desirable. <u>Id.</u> **The second (Type II) "is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated**." <u>Id.</u> In the second type of preliminary agreement, the parties **"bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement."**
>
> In differentiating between Type I and Type II agreements, we are mindful of the twin concerns Judge Leval articulated in <u>Tribune</u>, On the one hand, courts ought "to avoid trapping parties in surprise contractual obligations." <u>Tribune</u>, 670 F. Supp at 497. On the other hand, "it is equally important that courts enforce and preserve agreements that were intended as binding, despite a need for further documentation or further negotiation." <u>Id.</u> at 498.  (**<u>Emphasis Added</u>**)

See <u>Murphy v. Institute of International Education</u>, 32 F.4th 146 (2nd Cir. 2022).    (The Court enforced a settlement where there was a **<u>signed agreement</u>**, which we do not have in our case.)

30.     We note that in the May 11, 2022 cover e-mail sent with the purported term sheet Plaintiff's counsel indicated in relevant part:

> Keith and Kevin [*sic* should say Kenneth]- If you would please have your client and one of you sign this agreement we can move forward with giving notice to the Court and **we can render a final agreement draft** to you as well as provide instructions for remittance of payment.

> See Motion to Enforce **Exhibit 7**: May 11, 2022 E-mail from Plaintiff's counsel, p. 1.

31.     This text illustrates that the purported term sheet was not the final agreement and did not contain feedback or all the material terms that would be addressed in a final agreement draft.

32.     The Second Circuit created factors in a situation like this action where not all parties have signed a purported term sheet:

> The court is to consider (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing. See generally id. at 75–77; see also Restatement (Second) of Contracts § 27 comment c (1981).

> These circumstances may be shown by "oral testimony or by correspondence or other preliminary or partially complete writings." Restatement (Second) of Contracts § 27 comment c (1981). Considering these factors in the context of this case, we are left with the definite and firm conviction" that the district court erred in concluding that the parties here intended that a binding agreement could be reached prior to execution of a final document satisfactory in every respect to both sides. Anderson v. City of Bessemer, 470 U.S. 564, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)

> As we noted in R.G. Group, "[t]he actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution. Details that are unnoticed or passed by in oral discussion will be pinned down when the understanding is reduced to writing." 751 F.2d at 75. **That these "unnoticed" or "passed by" points of disagreement may in the long view be fairly characterized as minor or technical does not mean that a binding contract was formed prior to the time that they were finally worked out.**

See <u>Winston v. Mediafare Entertainment Corp.</u>, 777 F.2d 78 (2nd Cir. 1985).

33.     In our case, there were such points of disagreement, that Plaintiff's term sheet both included a material term (i.e., mutual releases) which had not been discussed and omitted the material term that restoration of Plaintiff's USPA Membership was no longer part of the final offer that we communicated to Court appointed mediator Holly Weiss, Esq.

34.     As can be seen in our communications with Ms. Weiss, early on in the negotiations it was made clear that while USPA membership (with no restoration of USPA instructional ratings) was initially being offered to Plaintiff but that offer was only up to a certain monetary threshold. We were advised that Plaintiff was concerned primarily with a substantial monetary offer and might not value a restoration of his revoked USPA membership.

35.     The United States District Court, S.D. New York looked at the partial performance factor under <u>Winston</u> and determined that when one party unilaterally prepared a draft of the written agreement before agreeing to do so with the other party that preparation did not constitute partial performance:

> Judge Dolinger determined that there was no partial performance, the second <u>Winston</u> factor. Defendants' objection to this determination is drawn almost verbatim from their initial motion to enforce. (Def.'s Mot. 9-10; Def.'s Obj. 17-18). The only new argument advanced is that the oral agreement contained all material terms and thus the drafting of the written agreement constituted partial performance, as Judge Dolinger himself allowed that "if the parties agree orally on all material terms and further agree that one side would draft a written instrument embodying those terms, the consequence of drafting might arguably amount to partial performance." (Def.'s Obj. 18.) However, as discussed below, the parties did not agree as to all material terms. **Further, the parties did not agree that one side would draft a written instrument embodying the terms**; while the parties did agree that the settlement was contingent on it being reduced to writing, this is distinct from the cases on which Defendants rely, where one party explicitly agreed

14

to draft the agreement. See <u>United States v. U.S. Currency</u>
<u>in the Sum of Six Hundred Sixty Thousand, Two Hundred</u>
<u>Dollars ($660,200.00), More or Less</u>, 423 F. Supp. 2d 14, 29
(E.D.N.Y. 2006). (**Emphasis Added**)

See <u>Johnson v. Fordham University</u>, 2016 WL 450424 (SDNY 2016).

(The Court adopts the Report to the extent that it finds the parties' oral agreement unenforceable

in the absence of a fully executed settlement agreement).

36.     Likewise in this action, Plaintiff's counsel unilaterally prepared a purported term

sheet that did not include all the material terms USPA wanted and then provided wiring

instructions for the settlement amount before the settlement agreement was prepared and signed

by all parties as anticipated by both sides with feedback on that agreement from both sides of the

mediation.

37.     A New York Court has held:

To establish the existence of an enforceable agreement, a plaintiff must establish
an offer, acceptance of the offer, consideration, mutual assent, and an intent to be
bound (22 NY Jur 2d, Contracts § 9). **That meeting of the minds must include**
**agreement on all essential terms** (*id.* § 31). (**Emphasis added**).

See <u>Kowalchuk v Stroup</u>, 61 A.D.3d 118 (1st Dep't. 2009).

38.     Plaintiff's own motion shows there was no meeting of the minds on the issue of

Mr. Garmashov's membership in the USPA.  The USPA's offer was, in essence, a settlement

payment and no membership.  Plaintiff now advises he intends to take the money, and continue to

seek reinstatement as a member.  Clearly here, we do not have a meeting of the minds on all

essential terms.

39.     Lastly, we note that Plaintiff's counsel seeks $2,500 in legal fees based on a case

from this Court which provides, in pertinent part:

In fact, most of the cases in this Circuit have declined to award attorneys' fees in
this situation. See e.g., <u>Francis v. Home Box Office</u>, 04 Civ. 7430, 2005 WL

1020863 at (S.D.N.Y. Apr. 28, 2005); <u>Omega Eng'g, Inc. v. Omega. S.A.</u>, 98 Civ. 2464, 2004 WL 2191588 at *11 (D.Conn. Aug. 12, 2004); <u>Edelman v. Smith Barney, Inc.</u>, 98 Civ. 691, 2000 WL 10209 at *6 (S.D.N.Y. Jan. 6, 2000); <u>Torres v. Costich</u>, 935 F.Supp. 232, 236 (W.D.N.Y.1996) ("There is no general rule that attorney's fees should be awarded on a successful motion to enforce a settlement agreement, but a court may award fees in such circumstances under the court's inherent power to award attorney's fees to a successful litigant when the opposing party has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.' In the absence of such behavior, fees are generally not awarded unless the settlement agreement expressly provides for a fee award.") (citations omitted);

<u>See</u> <u>Hostcentric Technologies, Inc. v. Republic Thunderbolt</u>, LLC, 2005 WL 1377853 (SDNY 2005).  Not Reported in F.Supp.2d.

The applicable case law shows that Plaintiff's motion to enforce and for attorneys' fees is without merit.

16

## **CONCLUSION**

40.     Plaintiff's motion to enforce is a bad faith attempt to get more than he bargained for and should be denied by this Court.  It is yet another improper attempt by him and his counsel to bully his way back in to the USPA.  The USPA is not intimated by such tactics.  We request that the Court deny Plaintiff's motion to enforce and grant such other and further relief as may be just and proper under the circumstances.

Dated: New York, New York
        May 31, 2022

Respectfully submitted,

**WINGET SPADAFORA
SCHWARTZBERG, LLP**
*Attorneys for Defendant, United States
Parachute Association, Inc.*
45 Broadway, 32nd Floor
New York, New York 10006
Telephone (212) 221-6900
Facsimile (212) 221-6989

By: ____/s/ *Kenneth McLellan*_____

Kenneth A. McLellan
Keith R.M. Roussel
Mclellan.k@wssllp.com
Roussel.k@wssllp.com

## <u>CERTIFICATION OF COMPLIANCE</u>

Keith R.M. Roussel an attorney admitted to practice in this Court certifies the following pursuant to Section II Section D of the Individual Practices of Judge John G. Koeltl:

The Memorandum of Law in Opposition is 5,259 words not including the cover page, certification of compliance, table of contents, and table of authorities.

New York, New York
Date: May 31, 2022

Respectfully Submitted

*/s/ Keith Roussel*

Keith R.M. Roussel